FILED

2016 Mar-02  PM 03:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| DAVID G. EASTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  2:13-cv-00639-SGC |
| | ) | |
| STATE OF ALABAMA | ) | |
| DEPARTMENT OF YOUTH | ) | |
| SERVICES;  and J. WALTER | ) | |
| WOOD, sued in his official | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff David G. Easter ("Easter") brings this action against Defendants State of Alabama Department of Youth Services ("DYS") and J. Walter Wood ("Wood"), in his official capacity as Executive Director of DYS, alleging the defendants discriminated against him in violation of Titles I and II of the American with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504" or "Rehabilitation Act").  The defendants have moved for summary judgment on all of Easter's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Doc. 22).  This Court has jurisdiction under 28 U.S.C. §§ 636(c),

---

[1]  In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 32).

1331, and 1367.  For the reasons stated below, the defendants' motion will be granted in part and denied in part.

## I.  STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party moving for summary judgment always bears the initial burden of proving the absence of a genuine issue of material fact.  *Id.* at 323.  If the moving party does not meet its initial burden, then the Court must deny the motion for summary judgment.  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) (citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)).

Once the moving party has met its burden, then the non-moving party must "go beyond the pleadings" and point to specific facts in the record to show there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324 (citation omitted).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (per curium) (quoting *Anderson*, 477 U.S. at 249). The court must "examine the evidence in the light most favorable to the non-moving party," drawing all inferences in favor of such party. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports that party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence.). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citation omitted).

## II.  <u>FACTUAL BACKGROUND</u>[2]

### A. Easter's Position at DYS

DYS is a state agency that, among other things, operates facilities for the rehabilitation of delinquent youth in the state of Alabama. (*See* Doc. 24-2 at 4).[3]

---

[2] To the extent any factual inferences are drawn, they are drawn in favor of Easter, the non-movant.

In April 2000, DYS hired Easter as a youth services aide assigned to its Vacca Campus in Birmingham, Alabama.  (*Id.* at 4-5, 32).   The Vacca campus is a secured facility housing younger boys who have been committed to DYS custody. (*See id.* at 4).  Easter's responsibilities as a youth services aide include supervising students at the Vacca Campus and physically restraining students when necessary. (*Id.* at p. 7).  As a youth services aide, Easter reports to a unit manager, who in turn reports to either a youth services specialist or a campus administrator.  (*Id.* at 5).

Easter was appointed as a shift supervisor effective September 1, 2007, and the appointment came with a three-step salary increase, which was approved through a recommendation for personnel action form signed on behalf of Wood.[4] (Doc. 23-5 at 2; Doc. 24-4 at 8).  In a letter to Easter confirming his new position, Wood stated Easter's appointment to shift supervisor was based on the recommendation of Tim Davis, Deputy Director for Programs and Client Services

---

[3] All citations to the record refer to document and page numbers as assigned by the Court's electronic filing system.

[4] On May 8, 2006, Joyce Delbridge, the campus administrator at Vacca Campus, attempted to promote Easter to the position of youth service child care worker.  (Doc. 24-2 at 33).  Delbridge, however, did not have the authority to promote Easter; instead, only Wood had that authority.  (*Id.* at 6).  Accordingly, when Tim Davis, DYS Deputy Director for Programs and Client Services, learned of Easter's promotion, he explained to Delbridge that the only person who could promote Easter was Wood, and her attempt to promote Easter was not allowed to take effect.  (*Id.* at 6-7).  The record indicates Easter was not informed the promotion did not take effect.  (*See* doc. 24-2 at 24).  Easter sent a grievance letter to Wood dated June 4, 2007, questioning why he had not yet received an increase in pay for his promotion to youth service child care worker.  (*Id.*).  The record indicates Davis contacted Easter and "[a]n agreement was made that [Easter] accept the [s]hift [s]upervisor position in exchange for the [y]outh [s]ervice [c]hild [c]are [w]orker position."  (Doc. 24-3 at 43).

at DYS ("Davis"), and "may be rescinded at any time based on the same recommendation." (Doc. 23-5 at 2). Easter's appointment as a shift supervisor was ongoing, and he did not have to be reappointed to remain in the position. (Doc. 24-2 at 11). As a shift supervisor, Easter took on the additional responsibility of carrying out duties assigned to the unit manager when the unit manager was not available. (*See id.* at 5).

### B. Control Force Tactic Training

DYS employees who may have to physically restrain students in the course of their employment are required to take control force tactic training. (Doc. 24-2 at 7). The training teaches employees how to defend themselves and how to physically restrain students without injuring them. (*Id.*). The control force tactic training consists of a 40-hour training course and a refresher course. (*Id.*). During the refresher course, instructors teach the proper techniques for restraining students and demonstrate the physical restraint tactics, and the DYS employees walk through the techniques. (*Id.* at 10). However, the refresher course is shorter and less physical than the full control force tactic training. (*Id.*).

Davis testified DYS requires employees to take both the 40-hour training course and the refresher course each year. (*Id.* at 7). Davis would not say if any DYS employees had been allowed to opt out of the 40-hour training course and take only the refresher course for control force tactic training. (*Id.* at 8).

5

Additionally, Davis testified DYS staff conducting the control force tactic training would ask if anybody in the training course was "physically impaired" and not able to complete the training, and would then gather information about those individuals who were impaired and pass the information to upper-level supervisors. (*Id.*).

According to DYS policy and procedures, the administrator of each facility and unit of DYS, rather than Davis, has the responsibility to ensure the DYS training requirements are met.  (Doc. 24-5 at 10).  Alicia Faire, Underwood Hall acting counselor at the Vacca Campus and Easter's unit manager, sent a memo to all Underwood Hall staff on or about May 5, 2009, regarding the control force tactic refresher course and stating as follows:

> [O]n May 12, 2009, Tuesday from 11:30 am to 1:00 pm there will be a unit [control force tactic] refresher course held in the training room. Those of you who have medical excuses must attend to get credit for this training.  The entire unit is required to attend.

(Doc. 24-8 at 2).  Davis testified he was unaware of Faire's memo.  (Doc. 24-2 at 10).

### C. Easter's Training Record

DYS requires Easter to attend control force tactic training because one of his responsibilities at the Vacca campus is restraining students when necessary.  (Doc. 24-4 at 9).  Easter attended the training on at least two occasions prior to 2007.  (Doc. 24-2 at 7; Doc. 24-4 at 9).  When Easter was scheduled to attend control

force tactic training in 2007, he notified his unit manager at DYS that he had a medical condition that prevented him doing the full training. (*See* Doc. 24-4 at 7). Specifically, Easter gave his unit manager a letter dated March 14, 2007, and signed by Easter's physician, stating Easter "has enlargement of his spleen related to sarcoid, [and] [b]ecause of this condition, he should be restricted to light duty at work." (Doc. 24-2 at 35; Doc. 24-4 at 7).

Easter testified his doctor told him to "stay away from physical activity that could rupture [his spleen.]" (Doc. 24-4 at 6). Based on his doctor's recommendation, Easter did not attend the full 40-hour control force tactic training between 2007 and 2010.[5] (*Id.* at 9-10). Easter testified he did not attend the full training because participants in the training go through "mock moves" in which their abdomens are exposed to a floor mat as they are taken down to the ground. (*See id.* at 11, 19). Easter testified he could not play the part of a student during the mock exercises in the full control force tactic training due to his enlarged spleen and that aspect of training is not something Easter would experience when restraining students on the job.[6] (*See id.* at 25).

---

[5] There is a discrepancy in the record regarding if Easter attended the full 40-hour control force tactic training course in 2011. (*See* Doc. 24-4 at 9, 15).

[6] DYS asserts there is no admissible evidence Easter objected to only a certain portion of control force tactic training because its attorney objected to the form of the question during the deposition and Easter's counsel did not rephrase the question. (Doc. 26 at p 6, n. 3). Although in general inadmissible evidence is not considered on a motion for summary judgment, the evidence may be considered if it could be reduced to admissible form at trial. *Jones v. UPS*

Easter attended the first day of the full 40-hour control force tactic training when no physical moves are done.  (Doc. 24-4 at 11).  But, when the instructors asked if anyone at the training had a medical restriction, Easter "showed them the medical restriction, [and] they said okay," so Easter did not attend the rest of the training.  (*Id.*).  Additionally, even though Easter did not take the full 40-hour control force tactic training from 2007 to 2010, he attended the refresher course each year that he did not attend the full course.  (*Id.* at 10-11, 25).  Easter believed the refresher course was sufficient to meet his control force tactic training requirement.  (*Id.* at 25).  Accordingly, he continued to restrain students at Vacca Campus when necessary.  (*Id.* at 10-11).

Davis does not know if Easter was exempted from the control force tactic training between 2007 and 2010, or if Easter had discussions with anyone at DYS about being exempted from control force tactic training because of a medical restriction.  (Doc. 24-2 at 9).  Davis also denies seeing the March 14, 2007 letter from Easter's doctor regarding his enlarged spleen.  (*Id.* at 8-9).

### D. DYS Request for Information from Easter

Davis learned some DYS employees were not attending the full 40-hour control force tactic training when DYS began experiencing staffing issues.  (Doc. 24-2 at 9).  Davis then looked into which employees were not taking the training

---

*Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (citations omitted).  Accordingly, the undersigned will consider Easter's testimony in ruling on DYS's motion for summary judgment.

8

and why. (*Id.*). As a result of Davis's investigation, any DYS employee who had a medical excuse exempting him from the 40-hour control force tactic training class, including Easter, received a memo from DYS requesting information to determine if he had a disability and if he could do his job. (Doc. 24-4 at 16; Doc. 24-5 at 12). Prior to receiving the memo from DYS dated November 17, 2010, Easter had not been questioned about his medical condition or restriction when he presented the letter from his doctor to the instructors at control force tactic training. (Doc. 24-4 at 25).

Easter completed the employee questionnaire attached to the memo by providing the following information: (1) he has an enlarged spleen; (2) he does not "perform control tactics training due to a doctor's excuse;" (3) "[he] can perform all functions of [his] job including restraining students, but [he doesn't] take control force tactics;" and (4) he feels "the department can accommodate [him] when it comes to [his] doctor's excuse for the enlarged spleen problem." (Doc. 24-5 at 17-18). Additionally, Easter responded that he could perform the essential functions of his job, including restraining students and "hav[ing] the physical ability/agility required to participate in and complete departmental training programs." (*Id.* at 14).

Also in response to the November 17 memo, Easter's physician completed a questionnaire dated January 11, 2011. (Doc. 24-5 at 20-22). Easter's physician

provided the following information to DYS:  (1) Easter has a physical impairment, specifically "history of sarcoidosis with enlargement of spleen (improved recently);" (2) Easter "should avoid physical contact [] because of spleen enlargement;" (3) Easter's impairment is permanent; and (4) "on recent exams [] Eater's spleen enlargement has improved—however I think it is best that he continue to avoid very strenuous physical activities such as physically restraining someone." (*Id.*).

### E. DYS Fact Finding Hearing

Based on the information Easter and his physician provided DYS in November 2010 and January 2011, Easter received a letter dated August 4, 2011, informing Easter that Wood "received a recommendation that employment actions, including possible demotion and/or suspension and/or dismissal, be taken regarding [his] employment as a [y]outh [s]ervices [a]ide." (Doc. 24-5 at 27).  The letter further states the "recommendation reveals [Easter's] failure to perform the essential functions of [his] position." (*Id.*).  Accordingly, a hearing was held on August 30, 2011, to determine if Easter was capable of performing the essential functions of his job with or without reasonable accommodations.  (Doc. 24-4 at 19; Doc. 24-5 at 27; Doc. 26-1 at 11).  Easter understood the subject of the hearing "was the possibility that [he] might not continue to be able to work for DYS," and

he also believed another purpose of the hearing was a possible demotion from his shift leader position.  (Doc. 24-4 at 19-20).

Davis was the DYS fact-finding officer at the hearing, and Easter gave sworn testimony at the hearing and was represented by an attorney.  (Doc. 24-2 at 24; Doc. 26-1 at 5, 12).  Easter testified he could do all of his job functions and that he restrained students "all the time," and Easter's attorney noted Easter "never had a problem at work physically restraining students."  (Doc. 26-1 at 15, 18).  Easter acknowledged his physician recommended he not restrain students and he was going against his physician's recommendation by doing so.  (*Id.* at 29).  Easter testified he did not go to the full 40-hour control force tactic training because he didn't want to be thrown down or "fall hard on his spleen," but he took the refresher course every year.  (*See id.* at 15, 40-41).  Easter's attorney stated that if the full 40-hour control force tactic training is an essential function of his job, he cannot do that function.  (*Id.* at 26).  The only accommodation Easter requested during the hearing was to not be "thrown down" during full control force tactic training.[7]  (*Id.* at 19, 21, 26).

At the hearing, Easter testified his enlarged spleen was "getting better," and his attorney stated Easter felt his physician was "being overly cautious" regarding

---

[7]  During the hearing, Davis disputed Easter's characterization and asserted DYS employees are "laid down" rather than "thrown down" during the physical exercises in control force tactic training.  (Doc. 26-1 at 30).  Davis did admit, however, that several employees had been hurt in control force tactic training.  (*Id.* at 32).

his recommendation Easter not restrain students.   (Doc. 26-1 at 15, 18). Accordingly, Easter requested an opportunity to return to his physician to get another recommendation regarding any restrictions on his ability to restrain students, and DYS gave Easter 30 days to submit updated information after the hearing.[8]  (Doc. 26-1 at 22, 54).

Davis asserts he learned of Easter's medical condition and enlarged spleen at the fact-finding hearing and he did not review the questionnaire completed by Easter's physician until the hearing.  (Doc. 24-2 at 21-23).  Davis does not recall if he formed an opinion at the hearing as to whether or not Easter's medical condition prevented him from performing essential functions of his job.  (*Id.* at 26).

### F.  Easter Removed from Shift Supervisor Position

On August 30, 2011—the same day as the DYS fact-finding hearing—Davis recommended Easter be removed as a shift supervisor, effective August 16, 2011. (Doc. 24-2 at 25, 28: Doc. 24-15 at 2).  Easter's removal from the shift supervisor position and his resultant decrease in pay was confirmed in a personnel action form and in a letter to Easter, which were both signed on behalf of Wood and dated August 30.[9]  (Doc. 24-4 at 53; Doc. 24-15 at 2).  Davis testified he made the

---

[8] Consistent with DYS's decision to give Easter 30 days to submit additional information after the August 30 hearing, Easter received a follow-up memo dated September 7, 2011, requesting Easter to provide updated information in response to the November 17, 2010 memo. (Doc. 24-16 at 2).

[9] Easter asserts he did not receive the August 30 letter from Wood.  (*See* doc. 24-3 at 42).

decision to remove Easter as a shift supervisor several years before the August 2011 hearing and it was only at the hearing that he learned Easter still held the position.[10]  (Doc. 24-2 at 11-13, 25; Doc. 24-4 at 23).  Accordingly, Davis claims he made the recommendation to remove Easter from the shift supervisor position based on the discovery that his prior instructions to remove Easter had not been carried out.  (Doc. 24-2 at 25).

Davis asserts he made the decision to remove Easter as a shift supervisor several years before the hearing based on problems at the Vacca Campus and issues with Easter's job performance.  (Doc. 24-2 at 12-13, 25).  Specifically, Davis asserts the Vacca Campus was in "utter chaos" between approximately 2007 and 2009, and DYS found it had "some serious issues at the supervisory level with regard to holding employees accountable."  (*Id.*).  Davis further asserts during that time period Easter "was not performing the duties of a shift supervisor as reported by his supervisors," so Davis instructed Mr. Thomas, the acting administrator at Vacca, to remove Easter as a shift supervisor.  (*Id.* at 12).  Davis's instructions to remove Easter as a shift supervisor in approximately 2007-2009 were not carried out, and there are no documents reflecting Davis's instructions.

---

[10] Davis's claim that he did not know Easter remained as a shift supervisor is disputed by Davis's testimony he reviewed Easter's performance appraisals, which stated in part  "Mr. Easter has performed his duties as a shift supervisor in the Underwood Hall program with perfection." (*See* doc. 24-2 at 17; Doc. 24-3 at 17).

Davis's testimony regarding Easter's performance is disputed by Easter's performance reviews.  First, Easter's performance review covering the period from August 1, 2007 to August 1, 2008 reflects that Easter's job performance exceeded standards, and he had no disciplinary actions during that time.  (Doc. 24-3 at 2-3).  Additionally, his review dated February 28, 2008 notes "Mr. Easter performs his assigned duties professionally at all times" and "[t]here are no weakness[es] in his job performance."  (*Id.* at 5).  Easter's performance review for August 1, 2008 to August 1, 2009 reflects that Easter's job performance met standards and Easter received only one oral disciplinary warning for documentation, and the issue was corrected.  (*Id.* at 6-7, 9).  Next, Easter's performance review for August 1, 2009 to August 1, 2010 reflects Easter meets standards and had no disciplinary issues and further states he had "taken on the responsibility of being the only shift supervisor … [and] consistently works overtime and multiple shifts to ensure the unit is covered."  (*Id.* at 13-15).  Finally, Easter's review dated February 8, 2011 states "Easter has performed his duties as the shift supervisor in the Underwood Hall program with perfection."  (*Id.* at 17).  Indeed, Davis admitted there is nothing in writing that reflects anything negative about Easter's job performance, other than the reference to one oral disciplinary warning for an issue that was corrected.  (Doc. 24-2 at 16).

### G. Easter's EEOC Charge

Although DYS removed Easter from his shift supervisor position on August 30, Easter's supervisor at Vacca waited until September 8 to give him a memo regarding the change and informing Easter "that effective immediately [he would] no longer hold the title of shift supervisor."  (Doc. 24-17 at 2).   Then, on September 13, 2011, Easter's physician updated his responses to the physician medical questionnaire and lifted the restrictions he had previously put in place, noting that Easter's enlarged spleen and history of sarcoidosis was resolved.  (Doc. 24-4 at 21, 49-51).

Easter filed an EEOC charge on September 15, 2011, asserting he was discriminated against because of his disability when he was removed from the shift supervisor position "before [his] doctor could submit additional information within the 30-day[] time frame that was addressed in the [August 30] fact finding hearing." (Doc. 24-1 at 2).  This action followed.

## III.  <u>ANALYSIS</u>

### A. <u>Claim against Walter Wood</u>

Easter asserts a claim for "[v]iolations of Title I of the [ADA] through 42 U.S.C. § 1983" against Wood, in his official capacity as Executive Director of DYS.  (Doc. 10 at 2-8).  The defendants argue Easter's claim against Wood is not viable because state officers acting in their official capacities are not subject to suit

under 42 U.S.C. § 1983 and the Rule 56 record is devoid of evidence against Wood.  (Doc. 23 at 2).

Easter did not respond to the defendants' arguments regarding his claim against Wood.  Indeed, none of Easter's brief in opposition to the defendants' motion for summary judgment addresses his Title I claim against Wood.  Instead, Easter's opposition brief only addresses his claims against DYS and refers to just a singular defendant—DYS.  (*See* doc. 25).  As a result, Easter has abandoned his claim against Wood, and Wood is entitled to a judgment in his favor as a matter of law.  *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("When a party moves for final … summary judgment, we have stated that 'it becomes incumbent upon the nonmovant to respond by, at the very least, raising in their opposition papers any and all arguments or defenses they felt precluded judgment in the moving party's favor.'") (quoting *Johnson v. Bd. of Regents*, 263 F.3d 1234, 1264 (11th Cir. 2001)) (internal quotation marks and alterations omitted); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), *cert denied*, 516 U.S. 817 (1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

### B. <u>Claims against DYS</u>

Easter asserts claims against DYS under Title II of the ADA and Section 504 based on his allegations he was demoted from his shift supervisor position in

violation of the ADA and Rehabilitation Act.  Specifically, Easter alleges DYS demoted him from his shift supervisor position "because of his perceived disability of sarcoidosis and an enlarged spleen in violation of the Rehabilitation Act … and the [ADA]."  (Doc. 25 at 1).

### 1. Section 504 claim against DYS

To prevail on a claim brought under Section 504, a plaintiff must be able to show the defendant "received or was directly benefited by federal financial assistance."[11]  *Doyle v. Univ. of Alabama - Birmingham*, 680 F.2d 1323, 1326-27 (11th Cir. 1982) (quoting *Brown v. Sibley*, 650 F.2d 760, 769 (11th. Cir. 1981)).  In its reply brief, DYS asserts Easter's Section 504 claim fails in part because he "offers no evidence of federal funds."[12]  (Doc. 26 at 1).  Arguments raised for the first time in a reply brief, however, will not be considered by the court.  *See Herring v. Secretary, Dept. of Corrections*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply

---

[11] In his amended complaint, Easter alleges DYS receives federal financial assistance. (Doc. 10 at ¶ 4).

[12] DYS also asserts in its reply brief Easter offers "nothing to meet the 'solely because of' standard under the Rehab Act" and, therefore, Easter's claim under the Rehabilitation Act fails as a matter of law.  (Doc. 26 at 1).  However, in Easter's brief in opposition to the defendants' motion for summary judgment, Easter argues "[t]he record contains evidence that Plaintiff was regarded as having an impairment and it was this perception that caused his demotion."  (Doc. 25 at 26).  Although Easter may not have used the exact language of the statute in his argument, he is essentially arguing DYS demoted him solely because of his perceived disability.  While DYS may strongly disagree with Easter's arguments, its assertion Easter offered nothing regarding whether DYS demoted him solely because of his perceived disability is an overstatement.  Whether Easter has shown a question of material fact regarding if DYS demoted him solely because of a perceived disability is addressed in section B(2)(c), *infra*.

brief are not properly before a reviewing court.") (citations and internal quotations omitted); *Pennsylvania Nat. Mut. Cas. Ins. Co. v. J.F. Morgan Gen. Contractors, Inc.*, 79 F.Supp.3d 1245, 1256 (N.D. Ala. 2015) (declining to consider an argument raised for the first time in a party's reply brief) (citations omitted).

Here, DYS did not explicitly raise the issue of federal funding in its initial brief or argue Easter did not present evidence DYS received or was directly benefited by federal financial assistance.[13]  (*See* doc. 23).  Instead, in a footnote in its initial brief, DYS simply states without citing to any authority, "the Rehab Act requires proof that the Defendant is covered by the receipt of federal funds."  (*Id.* at 3 n.1).  Additionally, among the eight grounds for summary judgment listed in DYS's motion for summary judgment is:  "The Plaintiff has not established the factual proof that DYS is covered by the Rehab Act."  (Doc. 22 at 2).

DYS's passing reference to the requirement of federal funding in its initial brief and the oblique reference to "factual proof that DYS is covered by the Rehab Act" in its motion are not sufficient to have raised the issue of whether Easter presented evidence of federal funding for purposes of his Section 504 claim.  Therefore, because it was raised for the first time in DYS's reply brief, the undersigned will not consider DYS's argument that Easter's Section 504 claim

---

[13] In his brief in opposition to the defendants' motion for summary judgment, Easter asserts "[t]he defendant does not dispute that as a [s]tate [a]gency it receives federal funding and has not moved for summary judgment on that ground."  (Doc. 25 at 1, n. 1).

fails because Easter did not present evidence of federal funding.  *See Herring*, 397 F.3d at 1342.  As a result, DYS is not entitled to summary judgment on Easter's Section 504 claim on the grounds that Easter did not present evidence DYS received or benefited from federal funding.

### 2.  Easter's prima facie case of discrimination

DYS argues it is entitled to summary judgment on Easter's claims against it because Easter cannot establish a prima facie case of discrimination in violation of the ADA or Rehabilitation Act.  (Doc. 23 at 12).  "The standard for determining liability under the Rehabilitation Act is the same as that under the [ADA]."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citations omitted).  In order to establish his prima facie case of discrimination under the ADA or Rehabilitation Act, Easter must show:  (1) he has a disability or is perceived as having a disability; (2) he is qualified for the position; and (3) he was subjected to unlawful discrimination because of his disability or perceived disability.  *Greenberg v. BellSouth Telecommunication, Inc.*, 498 F.3d 1258, 1263-64 (11th Cir. 2007) (quoting *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) and 42 U.S.C. § 12102(2)).  DYS argues it is entitled to summary judgment because Easter cannot establish any of the required elements of his prima facie case.  (Doc. 23 at 1, 3, 12).

Specifically, DYS asserts Easter cannot establish his prima facie case because undisputed evidence establishes Davis decided to remove Easter as a shift supervisor before he knew about Easter's medical condition, and therefore, the demotion could not have been because of a disability or perceived disability. (Doc. 23 at 12). The facts, however, are not as clear as DYS would like to believe.

Davis testified he made the decision to remove Easter as a shift supervisor and instructed a DYS acting administrator to do so several years before he learned of Easter's medical condition at the August 2011 fact-finding hearing. (Doc. 24-2 at 10-13). There are no documents in the record to reflect Davis's instructions to remove Easter as a shift supervisor before the August 30 hearing. However, when Davis decided to remove Easter as a shift supervisor after the fact-finding hearing, the decision was confirmed in a letter to Easter signed on behalf of Wood and in a personnel action form. (*See* doc. 24-4 at 53; Doc. 24-15 at 2).

Davis also testified he did not know his instructions to remove Easter as a shift supervisor had not been carried out until the August 30 hearing. (Doc. 24-2 at 25). Documents in the Rule 56 record dispute Davis's testimony. Easter's performance mid-appraisal dated February 2010 states "Easter has taken on the responsibility of being the only shift supervisor." (Doc. 24-3 at 13). Additionally, Easter's performance mid-appraisal dated February 8, 2011 states "Easter has performed his duties as the shift supervisor … with perfection." (*Id.* at 17).

According to Davis, he reviewed Easter's performance appraisals. (*Id.* at 16; *See also* Doc. 23 at 7). Therefore, he had notice before the August 30, 2011 fact-finding hearing that Easter retained his position as a shift supervisor.

Construing all of this evidence in favor of Easter, there is a question of fact regarding if Davis actually decided to remove Easter as a shift supervisor prior to the August 30, 2011 hearing. As a result, DYS is not entitled to summary judgment on the grounds Davis decided to remove Easter as a shift supervisor before he learned of Easter's medical condition. Additionally, as discussed below, there is sufficient evidence in the Rule 56 record to raise a question of fact regarding each of the elements of Easter's prima facie case of discrimination.

### a. perceived as having a disability

Easter does not have to show he has an actual disability to establish his prima facie case of discrimination under the ADA or Rehabilitation Act, but he can establish his prima facie case by showing he is perceived as having a disability. *See also* 42 U.S.C. § 12102(1)&(3). Evidence in the Rule 56 record raises a question of fact regarding if DYS perceived Easter as having a disability.

First, DYS sent a memo to Easter on November 17, 2010, requesting specific information about Easter's medical condition. (Doc. 24-12 at 2). The memo requested Easter to complete and return a Mandatory Employment

21

Functions and Performance Assessment, along with other documents, and stated in

pertinent part:

> At this time, job related information reflects that you are under a medical restriction which hinders your ability and capacity to perform your employment duties.  Moreover, these restrictions also appear to interfere with and/or prohibit you from performing some of the mandatory and essential functions of your position. … DYS must seek, obtain, and evaluate specific documentation, including your medical records, … in order to objectively review and ascertain whether your assigned medical restrictions qualify as a disability and, if so, whether you can satisfactorily perform the essential functions of your position with or without reasonable accommodations.

(*Id.*).  Next, several months after Easter submitted information in response to the

November 17 memo, he received a letter from DYS dated August 4, 2011, stating:

> Pursuant to your … completion of the Mandatory Employment Functions and Performance Assessment and[] the completion of the allied documents[], I have received a recommendation that employment action, including possible demotion and/or suspension and/or dismissal, be taken regarding your employment as a Youth Services Aide.  The recommendation reveals your failure to perform the essential functions of your position.  Thus a hearing should be conducted regarding your ability to perform the essential functions, duties, responsibilities and results of your position with or without reasonable accommodations.

(Doc. 24-5 at 27).  DYS then held a hearing on August 30, 2011, for the purpose of

"determin[ing] whether there needed to be any … action taken with regard to []

Easter's ability to perform essential functions" of his job.  (Doc. 24-2 at 24).

Viewing this evidence in the light most favorable to Easter, a reasonable jury

could conclude DYS perceived Easter as having a disability.  *See* 42 U.S.C.

22

§ 12102(3).  Thus, there is a question of fact regarding if DYS regarded Easter as having a disability.

### b.  qualified for the position

DYS asserts Easter was not qualified for the position of shift supervisor because he was "a bad shift leader" and he refused to attend mandatory training. (*See* Doc. 23 at 7-8, 13).  DYS relies upon Davis's testimony to show there is no genuine issue of material fact that Easter was not qualified to hold his position.

Davis testified Easter's supervisors reported that  Easter was not performing his assigned duties as a shift supervisor.  (Doc. 24-2 at 12).  Davis's testimony is disputed by Easter's performance appraisals.  In all of his performance appraisals between 2007 and 2011, Easter is rated by his supervisors as either meeting or exceeding standards, and the only disciplinary action noted in Easter's performance appraisals is an oral warning for a documentation issue, an issue that was corrected.  (Doc. 24-3 at 2-17).  Additionally, Easter's performance appraisals contain the following statements:

> Easter performs his assigned duties professionally at all times …[, and] [t]here are no weakness[es] in his job performance.

> Easter has taken on the responsibility of being the only shift supervisor … [and] consistently works overtime and multiple shifts to ensure the unit is covered.

> Easter has performed his duties as the shift supervisor in the Underwood Hall program with perfection.

(*Id.* at 5, 13, 17).

DYS argues there is no dispute between Davis's testimony and the performance appraisals because (1) "meets standard" is a low performance appraisal and (2) Davis instructed Easter's supervisors to lower their performance appraisals of him due to inconsistences between what Davis heard about Easter's performance and what was recorded in Easter's written appraisals. (Doc. 26 at 8-9). DYS's arguments do not address the written statements praising Easter in his performance appraisals or the complete lack of negative comments in Easter's performance appraisals. Thus, at the very least, based on Easter's performance appraisals, a reasonable jury could conclude Easter was adequately performing his duties and was not a bad shift leader.

DYS also argues Easter was not qualified to be a shift supervisor because he did not attend the full 40-hour control force tactic training each year. (*See* Doc. 23 at 9, 13; Doc. 26 at 9). However, there is evidence in the Rule 56 record to raise a question of fact regarding if the 40-hour control force tactic training was an essential requirement of Easter's job. First, Davis would not say if any DYS employees had been exempted from the full 40-hour training course and allowed to take just the refresher course to satisfy the requirement for control force tactic training. (Doc. 24-2 at 8). Davis acknowledged that instructors conducting the full 40-hour control force tactic training would ask DYS employees in the training if

they were "physically impaired" and not able to complete the training.  (Doc. 24-2 at 8).   In keeping with that testimony, Easter testified that when the instructors teaching the 40-hour control force tactic course asked if anyone had a medical restriction, he presented a letter from his doctor regarding his medical condition and then did not attend the remainder of the training.   (*See* Doc. 24-4 at 11).  Finally, Easter's unit manger sent a memo to certain DYS staff regarding the control force tactic refresher course and stating in part:  "Those of you who have medical excuses must attend to get credit for this training."[14]   (Doc. 24-8 at 2).  Viewing this evidence in the light most favorable to Easter, there is a question of fact regarding whether he was required to attend the full 40-hour control force tactic training to be qualified for his position at DYS.

Easter presented sufficient evidence to show that a reasonable jury could conclude he was qualified to be a shift supervisor.  Thus, he has shown there is a question of material fact regarding if he was qualified for his position.

### c.  demoted because of a perceived disability

Davis testified he did not learn of Easter's medical condition until the August 30, 2011 fact-finding hearing.  (Doc. 24-2 at 21-23).  Then, on the same day he learned of Easter's medical condition, Davis decided to remove Easter as a shift supervisor and DYS demoted Easter, resulting in a three-step decrease in pay.

---

[14] According to DYS policy, the administrator of each DYS facility and unit has the responsibility to ensure training requirements are met.  (Doc. 24-5 at 10).

(Doc. 24-2 at 25, 28; Doc. 24-15 at 2). Davis testified Easter was demoted after the hearing simply because Davis did not know before the hearing that his prior instructions to remove Easter as a shift supervisor had not been carried out. (*See* Doc. 24-2 at 11-13, 25). However, as discussed above, evidence in the record disputes this testimony and raises questions of fact regarding if Davis had previously decided to have Easter removed as a shift supervisor and if Davis knew Easter still held the position before the hearing. (*See* pp. 20-21, *supra*).

Viewing the evidence in the Rule 56 record in the light most favorable to Easter, Davis's decision to demote Easter almost immediately after learning of his enlarged spleen gives rise to a reasonable inference that Easter was demoted because of, or solely because of, a perceived disability. Thus, there is a question of fact regarding if DYS demoted Easter solely because of a perceived disability.

When the evidence in the record is viewed in the light most favorable to Easter, as required at this stage in the case, there is sufficient evidence to raise a question of fact regarding each of the elements of Easter's prima facie case. As a result, DYS is not entitled to summary judgment on the grounds Easter cannot establish his prima facie case.

### 3. DYS's proffered reasons for Easter's demotion and pretext

DYS asserts that even if Easter could establish a prima facie case of discrimination, it is still entitled to summary judgment because Easter cannot show

its reasons for demoting him are just pretext for its discriminatory motive.  (*See* Doc. 23 at 3, 13).  Specifically, DYS argues it decided to have Easter removed as a shift supervisor because Easter did not perform his duties as shift supervisor, did not attend mandatory training, and attempted to force DYS to accept his inconsistent positions regarding his ability to attend training and restrain students. (*Id.* at 3, 12 & 13).  Easter can demonstrate the reasons offered by DYS are pretext for its discriminatory intent by showing "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [DYS's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'"  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Sheridan v. E.I. DuPont De Nemours & Co.*, 100 F.3d 1061, 1072 (3rd Cir. 1996) (en banc)).

First, DYS asserts it removed Easter as a shift supervisor due to problems with Easter's job performance and because Easter was not performing his duties as a shift supervisor.  (Doc. 24-2 at 11-13).  However, apart from Davis's testimony, there are no documents to support this assertion.  Davis agreed there is "nothing in writing … that reflects anything negative on [Easter's] performance," other than a notation regarding an oral warning for a documentation issue that was corrected. (*Id.* at 15-16).  In fact, Easter's performance reviews reflect he was meeting or exceeding the standards expected of him.  (*Id.* at 13-16).  Although DYS argues

"meets standards" is a low evaluation, (Doc. 26 at 8), Easter's performance evaluations call into question DYS's assertion Easter was not performing his duties as a shift supervisor.

DYS also asserts Easter was demoted because he refused to attend mandatory training. (*See* Doc. 23 at 13; Doc. 26 at 9). DYS relies on Davis's testimony that DYS employees were required to attend both the 40-hour control force tactic training course and the refresher course each year. (Doc. 24-2 at 7). Again, Davis's testimony is disputed. As discussed above, evidence in the Rule 56 record presents a question of fact regarding if Easter was required to attend the full 40-hour control force tactic training or if he could satisfy his training requirement by attending the refresher course. (*See* pp. 24-25, *supra*). Thus, the Rule 56 record shows weaknesses in DYS's argument that Easter was removed from his position as a shift supervisor because he refused to attend required training.

Finally, DYS asserts Easter was demoted for trying to force DYS to accept his inconsistent positions regarding his abilities to attend training and restrain students. (Doc. 23 at 12; Doc. 26 at 10). Specifically, DYS argues it was duplicitous for Easter to rely on a medical restriction to avoid required training while ignoring the same restriction by restraining students. (Doc. 26 at 10). On the other hand, Easter contends he did nothing wrong by not attending the full 40-hour control force tactic training and he could not attend the full training because it

subjected him to conditions he did not face while restraining students on the job. (Doc. 24-4 at 10-11, 19, 25).  There is a question of fact regarding if Easter was required to attend the full 40-hour control force tactic training or if the refresher course was sufficient to satisfy his training requirement.  (*See* pp. 24-25, *supra*). Additionally, at this stage in the case, Davis's testimony that the full training exposed him to risks he did not face while restraining students on the job must be believed because courts do not make credibility determinations when ruling on summary judgment.  *Anderson*,  477 U.S. at 255 ("The evidence of the non-movant is to be believed….") (citation omitted).  Based on the disputed evidence regarding Easter's training requirements and Easter's testimony he was exposed to risks in training that he did not face while restraining students on the job, a reasonable jury could conclude there was nothing duplicitous about Easter's positions regarding his abilities to attend training and restrain students.

Viewing the evidence in the light most favorable to Easter, a reasonable jury could find DYS's "proferred explanation[s] [for demoting Easter are] unworthy of credence." *Kragor v. Takeda Pharmaceuticals America, Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).  As a result, there is a question of fact regarding if the reasons DYS gave for its decision to demote Easter are pretext for its actual discriminatory motive,

and DYS is not entitled to summary judgment on Easter's Title II and Section 504 claims against it.

## IV. CONCLUSION

Based on the foregoing, the defendants' motion for summary judgment (Doc. 22) is **GRANTED** with respect to Easter's Title I claim against Wood, and Easter's claims against Wood are due to be **DISMISSED WITH PREJUDICE**. The defendants' motion is **DENIED** with respect to Easter's Title II and Section 504 claims against the Department of Youth Services, and these claims will proceed.

**DONE** this 2nd day of March, 2016.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE